# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BIG DOG MOTORCYCLES, L.L.C.,

        **Plaintiff,**

v.                                                    **Case No. 04-2419-JWL**

BIG DOG HOLDINGS, INC.,

        **Defendant.**

_____

## MEMORANDUM AND ORDER

This is a declaratory judgment action involving claims for trademark infringement and unfair competition. Plaintiff Big Dog Motorcycles, L.L.C. (Motorcycles) seeks a declaratory judgment that its use of the mark "Big Dog Motorycles" in conjunction with the sale of motorcycles, motorcycle parts and accessories, promotional products (including apparel and collectibles), and related services does not infringe upon defendant Big Dog Holdings' (Holdings) marks, or otherwise constitute unfair competition under the Lanham Act. This matter is before the court on Motorcycles' motion for summary judgment (Doc. 69). By way of this motion, Motorcycles asks the court to grant the requested declaratory relief on the grounds that Holdings has failed to establish a genuine issue of material fact concerning the likelihood of confusion among consumers as to the source, sponsorship, or affiliation of Motorcycles' products. For the reasons explained below, the court finds that no rational trier of fact could find a likelihood of confusion between the two sets of products. Accordingly, the court will grant Motorcycles' motion in its entirety.

## STATEMENT OF FACTS

Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are uncontroverted or, if disputed, are viewed in a light most favorable to Holdings, the non-moving party.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (setting forth summary judgment standards).

**A.**   **General Nature of the Parties and the Origin of Their Dispute**

Holdings is a holding company for related entities that market and sell clothing and other consumer products bearing the "Big Dogs" and "Big Dog" trademarks and other related marks, which it also licenses to third parties for a variety of goods and services.  Holdings' predecessor, Sierra West, first used the name "Big Dogs" in 1984.  In 1992, Andrew Feshbach, Holdings' current chief executive officer, and another investor, Fred Kayne, bought the assets of Sierra West out of bankruptcy.  They changed the name of the company to Big Dog Holdings for the parent corporation and established operating companies of Big Dogs U.S.A., Inc. and Big Dogs Sportswear, among others.  Big Dog U.S.A., Inc. develops, markets, and sells a collection of high quality consumer lifestyle products such as activewear, casual sportswear, accessories, and gift items under the brand name "Big Dogs."  Holdings is the owner of numerous trademarks and service marks registered with the United States Patent and Trademark Office and around the world for the mark "Big Dogs" and related marks, including "Big Dogs" for all manner of clothing (specifically including t-shirts) and a number of other consumer goods and services, including a wide variety of recreational and sports equipment,

2

watches and clocks, sunglasses, and mail order and retail store services featuring clothing, jewelry, accessories, home furnishings, and sporting goods.[1]

Motorcycles manufactures and sells high-end customized motorcycles. Sheldon Coleman is Motorcycles' founder and chief executive officer. According to Mr. Coleman, he first used the term "Big Dog" in conjunction with one of his other endeavors in the early 1980s. At that time (before Holdings' predecessor Sierra West first utilized the Big Dog mark in 1984), Mr. Coleman organized a band called Dewy and the Big Dogs. Sometime after 1985, Mr. Coleman saw a t-shirt made by Sierra West that had a picture of a St. Bernard-like dog with the words "Big Dogs." Mr. Coleman contacted Sierra West and suggested a co-promotion on a big dog theme between Sierra West, Dewy and the Big Dogs, and The Coleman Company, a company for which he was at that time the chief executive officer. Sierra West rejected Mr. Coleman's proposal. In 1988, Mr. Coleman continued his commercial use of the term "Big Dog" when he incorporated Big Dog Productions, Inc., a music recording studio in Wichita.

In 1992, Mr. Coleman began customizing Harley Davidson motorcycles in his own residential garage with the help of a motorcycle mechanic. Later that year, he moved the operation to a larger, commercial space and formed the company Big Dog Custom Motorcycles.[2] By 1993, Big Dog Custom Motorcycles had three people working to customize

---

[1] A number of these marks were registered prior to 1994 (when Motorcycles was formed) and many were based on use prior to 1994.

[2] There is no evidence that Mr. Coleman made any further attempt (after Sierra West rejected his suggestion of doing a co-promotion between the two companies in the 1980s) to determine how Holdings was using its marks at the time he adopted this as the name of his motorcycle company. He stated in his deposition that at the time he formed his motorcycle

Harley Davidson motorcycles, which were then sold.   In 1994 the company shifted from customizing Harley Davidson motorcycles to making its own motorcycles from after-market parts.   Consistent with this new approach, Mr. Coleman changed the name of the business to Big Dog Motorcycles, L.L.C., the name that it has today.   According to his deposition testimony and an affidavit from him, he believed "Big Dog Motorcycles" was an appealing name because it connoted a certain image that fit well with motorcycle culture, it had a good rhythm and sound, and he had a previous association with the term "Big Dog."

In June of 1995, Holdings contacted Motorcycles claiming that Motorcycles' use of the name "Big Dog Motorcycles" violated Holdings' trademarks.   Holdings expressed concern that Motorcycles' sale of t-shirts constituted an infringement of Holdings' trademarks, but Holdings stated that it did not at that time oppose Motorcycles' use of the name Big Dog Motorcycles on motorcycles.   Holdings demanded that Motorcycles cease using the "Big Dog" mark or any confusingly similar mark in connection with any t-shirts or other items of apparel.   This led to the two companies filing lawsuits against each other.   These actions were eventually settled in 1997.   The settlement agreement provided that Motorcycles would assign its rights in the marks "Big Dog," "Big Dog Motorcycles," "Big Dog Service Center," and the "Big Dog Motorcycles" logo to Holdings in return for an exclusive, perpetual license to use the marks in conjunction with its business under the terms set forth in a license agreement.

---

business he planned to sell clothing under the "Big Dog Motorcycles" mark.

Holdings unilaterally terminated the license agreement in August of 2004. Under the terms of the settlement agreement, this meant that the parties' relative positions reverted to the time of the settlement. At the time Holdings terminated the license agreement, Holdings demanded that Motorcycles cease using the names "Big Dog" and "Big Dog Motorcycles" with its business. Shortly thereafter, Motorcycles brought this action seeking a declaratory judgment of noninfringement and no unfair competition. Following is a more thorough explanation of the manner in which each of the parties uses the marks at issue.

**B.    Big Dog Holdings, Inc.**

A picture of the exterior of a Big Dogs store, a copy of its catalog, and its Internet website reflects that Holdings uses the wording "Big Dogs" in stenciled capital letters on its signage, point of sale materials, catalogs, and web site, and that this logo is commonly displayed in close proximity to Holdings' distinctive black and white dog. Holdings frequently, but not exclusively, uses this black and white, anthropomorphic dog "character" on many of its products. For example, Holdings' biggest selling product is t-shirts and the "Big Dogs" logo in combination with the black and white dog appears on the vast majority of Holdings' t-shirts as a decorative element and/or on the tags and labels.

The "Big Dog(s)" marks are used so that products on which they appear will appeal to a wide range of consumers who want to send a message about themselves to those who see them with the "Big Dog(s)" products: men, women, and children of all ages, and especially baby boomers and their children who have an interest in any of a wide variety of leisure or recreational activities—including motorcycle riding. The kind of "interest" Holdings seeks

from consumers includes not just those consumers who participate in such activities, but those consumers who aspire to so participate or who just wish to convey an attitude or experience generally associated with such activity.   Holdings' apparel line often attempts to be humorous by portraying caricatures of dogs in different situations.   Holdings' t-shirts often include parodies of other designs and trademarks that are intended to be humorous.   These same themes are used on men's underwear, fleece products, and other items.

The "Big Dog(s)" brand is designed to permit consumers to convey to others various modes of an "in charge" attitude—from tongue-in-cheek to "edgy."   Holdings' products are designed to appeal to enthusiasts of various recreational and leisure activities who wish to convey a variety of attitudinal modes.   Holdings follows (and sometimes leads) the leisure/recreational marketplace.   For example, when cigar-smoking became popular several years ago, Holdings developed new graphics to appeal to cigar smokers.   Similarly, Holdings has developed a "Big Dog Surf Company" identity to capitalize on those interested in the surfing lifestyle, a "Big Dog Trucking Company," a "Big Dog Construction Company," and a "Big Dog Garage," and other "fake company" identities.   Holdings carries a full line of extra and extra-extra large sizes, again consistent with the "large and in charge" attitude the brand seeks to convey.

Holdings (or its predecessor) has been selling t-shirts depicting motorsports, including motorcycles, since at least 1990.   Some motorcycle enthusiasts wear Holdings' apparel.   Since December of 1996, Holdings has sold more than $4 million worth of t-shirts (more than

6

250,000 individual t-shirts) depicting motorcycles or parodying the Harley Davidson motorcycle brand.[3]

Holdings identifies its competitors as branded, active wear companies like J. Crew and the Gap as well as character merchandise companies such as Disney and Warner Bros. Holdings' customers include a broad customer base but do not reach ethnic, urban, or teenage customers.

Holdings currently sells its products in 181 company-owned retail stores located in forty-two states, through its nationally and internationally distributed mail order catalog, through its Internet website at www.bigdogs.com, and through selected licensees. Holdings primarily sells its clothing and other items in wholly owned retail stores located in shopping malls, typically in outlet or discount malls. Holdings' retail stores sell only "Big Dog" brand products. Out of its 181 retail stores, all but twelve are located in outlet malls. The twelve not located in outlet malls are located in other areas that have high consumer foot traffic, including power center malls, strip center malls, and malls in tourist locations. Approximately ninety-five percent of Holdings' total net sales occur through its chain of wholly owned stores located

---

[3] One of Holdings' factual allegations states that "Mr. Coleman would object if Holdings were to create a t-shirt design for 'Big Dog Choppers' because he thinks it would be 'confusing' to consumers" and that he "also thinks Holdings' 'Dogs on Hogs' t-shirt is likely to be confused with Motorcycles' shirts." SOF ¶ 106. The court finds this factual allegation to be immaterial because the issue here is not Mr. Coleman's perceptions about confusion between the parties' marks but rather whether a rational trier of fact could find that consumers are likely to be confused by the similarity of the marks as they encounter those marks in the marketplace, which is an issue that must be analyzed in light of the six nonexhaustive factors that are used to determine whether a likelihood of confusion exists between the two marks.

in shopping malls.  Holdings does not now sell its products on a wholesale basis, i.e., to others for resale in places like department stores, but it has done so in the past, and likely will do so again in the future.

Internet and mail order sales account for approximately five percent of Holdings' total sales.  This year, Holdings already has sold approximately 100,000 t-shirts over the Internet and via direct mail alone.  Since 1992 Holdings has sold approximately two million t-shirts over the Internet and by mail order.

Holdings generally sells its t-shirts and other adult apparel at a discount in its retail stores.  For example, adult sized t-shirts at Holdings' retail stores generally are marked for approximately fifteen dollars and often further discounted by being offered on a two-for-one pricing basis.  Holdings prices its clothing higher in its catalogs and on its website so that it can advertise in the outlet store that the clothing is being sold at a discount.

Holdings primarily advertises its products via the products themselves.  The products, such as t-shirts and coffee mugs, almost exclusively are meant to be used in public.  Holdings designs products to permit the consumer to convey his or her "Big Dog" attitude to others, and also so as to permit Holdings to familiarize those others with the "Big Dog" marks and brand.  Holdings' products, particularly its graphic apparel, are "walking advertisements" for the "Big Dogs" brand.  Holdings also sends out millions of catalogs to consumers promoting its apparel.  Holdings distributes catalogs to consumers who request them, who order from someone else's catalog, and who are listed on other retailers' for-sale mailing lists.  Holdings mails catalogs at least twice every year, and in 2004 alone mailed 1,599,878 catalogs to

consumers.   Holdings has mailed more than twenty-three million catalogs to consumers since 1993.   Holdings occasionally uses billboard signage to promote its stores.   Holdings employs a "grass roots" marketing strategy including local and charity sponsorships and community-oriented promotional events.   In the late 1980s, for example, Holdings' predecessor sponsored a race car.   Holdings owns and uses (through a licensee) the "Big Dog Shootout" mark for drag racing, first used in 1996.   Holdings' products are available on the Internet, and Holdings pays others to link to Holdings' site.   Holdings does not send representatives to motorcycle rallies or events, nor does it advertise its products in magazines specifically aimed at motorcycle enthusiasts.   Since Holdings acquired the "Big Dog" marks in 1992, it has spent more than $15 million in advertising, exclusive of the costs of the "walking advertisement" products themselves.

Holdings has registered the mark as a word mark (i.e., without a specific design) and uses the mark in a wide variety of typefaces, styles, and positions on its products, particularly as viewed in public (as opposed to on apparel care labels, for example).   Holdings also uses "Big Dog" in the singular.   Following is a sampling of the manner in which Holdings' uses the word mark in its logos:[4]

---

[4] The court realizes that Holdings uses its marks in a variety of ways and these two logos are not intended to be representative samples.   Rather, they are simply a starting point to begin to familiarize the reader with Holdings' marks.

 

### C. **Big Dog Motorcycles, L.L.C.**

Among American-made motorcycles, Motorcycles is second in sales only to Harley Davidson. Motorcycles is the largest manufacturer in the world of the popular "chopper-style" motorcycles. The company recently received the number one ranking of all motorcycle manufacturers from the prestigious dealer magazine, "Dealernews Magazine." This rating placed Big Dog Motorcycles above Harley Davidson, all Japanese, and all European motorcycle manufacturers in product style, product features, and customer service. Motorcycles makes a range of bikes that are priced at retail from approximately $27,000 to $34,000. These bikes are over-the-road, cruiser models that have names such as Ridgeback, Pitbull, Chopper, Mastiff, and Bulldog. Motorcycles offers these five base models of motorcycles that may be customized with various performance parts and accessories at the buyer's request. Another key feature of the motorcycles is the detailed, hand painted graphics that may be selected from a series of stock graphics and colors, or specially ordered. Motorcycles also sells parts and accessories for its motorcycles. A majority of the parts are sold to dealers to service the bikes. The accessories include items such as customer passenger seats, performance exhausts, and sissy bars.

Motorcycles also sells apparel and other promotional items. The apparel consists primarily of shirts, caps, and jackets carrying the Big Dog Motorcycles' brand name and/or logo thereon. The designs that Motorcycles uses on its apparel and other products include, for example, Maltese crosses, flames, and/or skulls.[5] The other promotional items that Motorcycles sells include calendars, bar stools, pens, shot glasses, and pocket knives that bear the Big Dog Motorcycles logo.

Motorcycles usually, but not always, uses "Big Dog Motorcycles" in a logo form consisting of the words "big dog" displayed in lower case stylized lettering bordered by upper and lower lines with the word "MOTORCYCLES" in capital letters underneath, as follows:[6]



All apparel that includes the words "Big Dog" also has the word "Motorcycles" in close proximity. Mr. Coleman's affidavit states that this logo is prominently featured on signage and

---

[5] As Holdings points out, these types of designs are not exclusively of interest to motorcycle enthusiasts or unique to motorcycle company clothing, but rather are used on different types of apparel.

[6] As with Holdings' sample logos set forth above, this sample logo of Motorcycles is simply intended to be a starting point to familiarize the reader with Motorcycles' mark.

11

point of sale displays at the dealerships,[7] on Motorcycles' web site and promotional materials, and on the motorcycles and some parts and accessories. This logo also appears as a decorative element on many of the promotional items.

Motorcycles sells its new[8] motorcycles exclusively through its own showroom in Wichita, Kansas, and through ninety-four authorized dealers, eight of whom are "branded dealers" that incorporate "Big Dog Motorcycles" as part of their name. Motorcycles also sells its apparel and other promotional items through its own showroom and its authorized dealers.[9] Motorcycles' products carry the name "Big Dog Motorcycles" or, for some parts and accessories, simply "BDM." Motorcycles' promotional items are only available through its motorcycle dealerships.

The following chart sets forth Motorcycles' sales since 1997 for its three categories of products:

---

[7] Holdings states that it controverts this statement of fact to the extent that Mr. Coleman states this logo is prominently featured at Motorcycles' dealerships, rather than only its showroom in Wichita. Holdings' argument is based on the fact that one of the exhibits Motorcycles cited in support of this factual allegation consists of pictures of Motorcycles' showroom only, not other dealerships. But, Motorcycles supported this factual averment not only by referencing the pictures of the showroom, but also Mr. Coleman's affidavit which more broadly refers to Motorcycles' dealerships in general. Holdings has submitted no evidence to controvert this factual allegation and therefore the court deems it admitted for summary judgment purposes.

[8] Holdings points out that this factual allegation excludes re-sales of used Big Dog Motorcycles by original owners, some of which are being sold on the Internet under the name "Big Dog." Holdings has not, however, controverted that Motorcycles' apparel and other promotional products are sold only through Motorcycles' showroom and its authorized dealers.

[9] This includes its dealers' websites, as discussed below.

| Year | Motorcycle Sales | Parts, Accessories, & Service Sales | Clothing Sales | Total Sales |
|---|---|---|---|---|
| 1997 | $4,223,168 | $262,469 | $15,992 | $4,501,629 |
| 1998 | 5,778,236 | 236,917 | 16,933 | 6,032,086 |
| 1999 | 15,075,076 | 235,708 | 43,188 | 15,353,972 |
| 2000 | 20,552,628 | 492,782 | 120,221 | 21,165,631 |
| 2001 | 30,860,589 | 1,037,565 | 213,422 | 32,111,576 |
| 2002 | 42,903,568 | 1,423,674 | 310,956 | 44,638,198 |
| 2003 | 78,527,769 | 2,335,283 | 406,722 | 81,269,774 |
| 2004 | 100,270,286 | 4,163,883 | 605,326 | 105,039,495 |
| YTD 2005 as of 6/30/05 | 61,310,379 | 4,143,467 | 404,349 | 65,858,195 |
| TOTAL | $361,921,137 | $14,429,205 | $2,137,109 | $378,487,451 |

During each of the last five years, promotional clothing and consumer product sales have accounted for less than one percent of Motorcycles' gross sales.[10]   Notwithstanding this, Motorcycles believes that its sales of apparel and other consumer products bearing the "Big Dog Motorcycles" logo is important to its ability to sell motorcycles through its dealership network.   Mr. Coleman explains that this is because wearing a Motorcycles' shirt or cap or

---

[10]   Holdings points out that the dollar value of Motorcycles' motorcycle and clothing sales, combined with the average prices of those items, indicate that Motorcycles has sold approximately 85,000 clothing items and only approximately 10,000 motorcycles since 1997. Holdings also points out that Motorcycles' clothing sales are on pace to approach $1 million in 2005 alone.   While the volume of Motorcycles' clothing sales might provide some understanding of why Holdings has chosen to devote its resources to litigating this case, the court cannot envision how this consideration is relevant to whether consumers are likely to be confused by the parties' marks.

13

displaying a Big Dog Motorcycles barstool are important ways of identifying oneself with the motorcycle culture   and to other motorcycle enthusiasts.   The retail price of Motorcycles' branded t-shirts is usually approximately twenty dollars.

Motorcycles competes with all motorcycle companies, but Mr. Coleman views Motorcycles' primary competitors as American motorcycle manufacturers and custom shops such as American Ironhorse and Vengeance.   A Big Dog Motorcycles brand motorcycle is rarely the first motorcycle owned by the purchaser.   Seventy-eight percent of Motorcycles' customers have more than five years of experience riding motorcycles.   Sixty-four percent of this group have more than ten years of riding experience before purchasing a Big Dog Motorcycles brand motorcycle.   Similarly, sixty-three percent of the purchasers of Big Dog Motorcycles brand have also owned other motorcycles.   Eighty percent of Motorcycles' customers are over the age of thirty-four; forty-three percent of them are over the age of forty-five.   Of course, Motorcycles sells its clothing and promotional items to people who have not necessarily purchased its motorcycles.

Motorcycles has a website on which it displays its bikes, apparel, collectibles, and other items.   In 2004, Motorcycles discontinued selling motorcycle parts, accessories, branded apparel, and collectibles on its web site to strengthen dealer sales.   Motorcycles' website states: "To purchase anything from our apparel line, please contact your nearest Big Dog Motorcycle dealer.   For a complete listing of Big Dog Motorcycle dealers, use your dealer locator."   Of Motorcycles' ninety-four dealers, twelve currently sell apparel on their web sites.

A number of the dealers have web sites on which they show the different models of motorcycles, but customers are not permitted to purchase a motorcycle from the web sites.

Motorcycles primarily advertises its motorcycles in media that are likely to be viewed by motorcycle enthusiasts.   For example, it advertises in nationally distributed motorcycle publications such as "American Iron" and "Easy Riders."   It sometimes advertises on nationally syndicated cable television shows such as "American Chopper," "Texas Hardtails," and "American Thunder."   Motorcycles promotes its motorcycle brand by attending motorcycle rallies and events.   Motorcycles also participates in cooperative advertising with its dealers for local newspaper and radio advertisements in their area featuring the dealership and its Big Dog Motorcycles' brand of bikes.   Mr. Coleman testified in his deposition that Motorcycles' arena is the "cruiser lifestyle" established by Harley Davidson, to whom Motorcycles looks, among others in the industry, when designing apparel and collectibles.   Since 2001, Motorcycles has spent over $2 million advertising and promoting its Big Dog Motorcycles' brand.

None of Motorcycles' dealers carries any of Holdings' products.   Motorcycles does not use graphics or pictures of dogs in its logo, advertising, or on any of its products.[11] Motorcycles does not distribute mail order catalogs.   Mr. Coleman's affidavit states that Motorcycles' dealerships are not typically located in outlet malls or shopping complexes, and Holdings has not submitted any evidence to the contrary.

---

[11] One of Motorcycles' authorized dealers uses the image of a dog in its own advertising, but there is no evidence in the record indicating that Motorcycles itself does so.

15

**D.       Survey Evidence Regarding Customer Confusion**[12]

Holdings' retained Lou Weiss to conduct two surveys to measure the likelihood of confusion.   One survey was a non-comparative survey.   The other was a comparative survey. The surveys were conducted in eight malls across the country.   Four of the malls had a "Big Dogs" store and four of the malls did not have a "Big Dogs" store.   None of the interviews were conducted at motorcycle dealerships or other locations where motorcycle enthusiasts are known to shop.   The universe of respondents in both surveys was prospective purchasers of t-shirts and caps.

In the non-comparative survey, Mr. Weiss surveyed three hundred respondents. Approximately one-half of the respondents were shown a photograph of three products sold by Holdings, including a t-shirt, a mug, and a hat ("Photo A").   The other one-half were shown a photograph of three products sold by Motorcycles, including a t-shirt, a mug, and a hat ("Photo B").   Both groups of respondents were asked a series of questions designed to elicit whether the respondent was familiar with the brand of products depicted in the photograph, whether they could identify the brand, and what other products the respondent believed were produced by the company that produced the products in the photograph.   Seventy-seven percent of the respondents incorrectly identified the brand name of Motorcycles' products as "Big

---

[12] Motorcycles presented evidence from the depositions of Mr. Feshback, Holdings' executive vice president and general counsel Anthony Wall, and Mr. Coleman regarding instances in which they were questioned by others about confusion between the two companies.   Holdings does not, however, rely on this evidence to establish actual customer confusion.   Because Holdings does not rely on this evidence to withstand summary judgment, then, the court will not delve into this evidence. *See also* note 16, *infra*.

Dog" or "Big Dogs."  A small percentage of respondents (10%-25%) associated Motorcycles with motorcycles or motorcycle accessories.  Consumers did not distinguish between the products produced by these two different companies.

In the comparative survey, Mr. Weiss surveyed 299 respondents.  They were shown an array of twelve photographs of products.  Six of the photographs depicted hats and one side of t-shirts sold by Holdings.  The other six photographs depicted hats and one side of t-shirts sold by Motorcycles.  The respondents were asked to sort the twelve photographs by the company they believed made the products depicted in the photographs.  Ninety-five percent of the respondents failed to accurately sort the products.  Twenty-eight percent of the respondents completed the exercise with the lowest possible score -- one that would have been achieved by a random sort.  Based on the survey results, Mr. Weiss concluded that only five percent of the respondents were able to divide the products into two piles without error.

Based on the results of the two studies, Mr. Weiss opined that there was a "substantial level of confusion by consumers" between the products of the two companies.

**E.**     **Common Use of the Term "Big Dog"**

Motorcycles has submitted a variety of evidence relating to use of the term "Big Dog." This evidence consists of the following.  First, a search of the Dun & Bradstreet database listed 1,782 companies in the United States doing business and using the phrase "Big Dog" in their names.  This includes 763 listings of companies using the name "Big Dog" that are not affiliated with Holdings or Motorcycles.  Additionally, a search of federal and state trademark

17

office records revealed that there are eleven issued federal registrations[13] and thirty-three issued state registrations for marks incorporating the term "Big Dog" or "Big Dawg" that are owned by the parties other than Holdings and Motorcycles.  Also, research on the Internet performed on behalf of Motorcycles revealed that the phrase "Big Dog" is used pervasively on the Internet.  A search on the "Google" search engine revealed over 19 million hits,[14] including references to dozens of businesses, organizations, and people using the name "Big Dog."  This Internet research also revealed that the phrase "Big Dog" is commonly used in popular culture and has been defined in a number of different ways in popular culture.  For example, the phrase has been used generally to describe someone who is in charge and it also has been used to identify particular individuals such as former President Bill Clinton.

Holdings is aware that a number of companies use the mark "Big Dog" in commerce such as Big Dog Logistics, Big Dogs Hospitality Group, Big Dog Trucking, and Big Dawg Automotive Mechanical Service.  Big Dogs Hospitality Group uses the names "Big Dog's Bar and Grill" and "Big Dog's Bar and Casino" in Las Vegas, Nevada.  Holdings has consented to Big Dogs Hospitality Group's registration of the term "Big Dog Casino" and has specifically

---

[13] Of these federal trademark registrations, five of them are owned by either Big Dogs Hospitality Group, Inc. or Metra Electronics Corp., both of which have agreements with Holdings limiting their use of any "Big Dog" logo on apparel and otherwise.

[14] Holdings has submitted evidence surrounding the number of hits achieved by searching other terms on the Internet.  The court need not delve into this evidence, however, because the court finds that in resolving Motorcycles' summary judgment motion Holdings' marks must be regarded as having strong commercial value notwithstanding the evidence Motorcycles has presented to attempt to establish the contrary.  Thus, Holdings does not need to present evidence to attempt to rebut Motorcycles' evidence on this issue.

18

agreed that Big Dogs Hospitality Group may use the mark "Big Dog Casino" on souvenir clothing and other select items sold at the casino.   Holdings has also consented to the use of the mark "Big Dog Installers" by Metra Electronics Corporation.   Holdings specifically permitted Metra to produce promotional items such as t-shirts, mugs, and license plates bearing the mark "Big Dog Installers Club."   Additionally, years ago Holdings' predecessor agreed to allow Glenn Robinson, an NBA basketball player, to use the words "Big Dog" on certain items including t-shirts.

**F.      Motorcycles' Current Motion for Summary Judgment**

Based on these facts, Motorcycles seeks two forms of declaratory relief.   In Count I, Motorcycles seeks a declaration that its use of the mark Big Dog Motorcycles in conjunction with motorcycles, motorcycle parts and accessories, promotional products (including apparel and accessories), and related services does not infringe upon Holdings' marks using the terms Big Dog and Big Dogs under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).   In Count II, Motorcycles seeks a declaration that its use of the mark Big Dog Motorcycles in conjunction with motorcycles, motorcycle parts and accessories, promotional products (including apparel and accessories), and related services does not constitute unfair competition with Holdings under § 32 of the Lanham Act, 15 U.S.C. § 1114.   Motorcycles' argument is grounded in the absence of a likelihood of confusion between the two parties' marks.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279

F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.  *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

"Likelihood of confusion forms the gravamen for a trademark infringement action" under 15 U.S.C. §§ 1114(1), 1125(a).  *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999).  The Tenth Circuit has identified six nonexhaustive factors that serve as a guide for determining whether a likelihood of confusion exists between two marks: (a) the degree of similarity between the marks; (b) the intent of the alleged infringer in adopting its mark; (c) evidence of actual confusion; (d) the relation in use and the

21

manner of marketing between the goods or services marketed by the competing parties; (e) the degree of care likely to be exercised by purchasers; and (f) the strength or weakness of the marks. *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833 (10th Cir. 2005); *King of the Mountain Sports*, 185 F.3d at 1089-90. The heart of the court's analysis is the similarity of the marks. *King of the Mountain Sports*, 185 F.3d at 1090. Yet no single factor is dispositive and the court must consider all factors as an interrelated whole. *Team Tires Plus*, 394 F.3d at 833. At all times, "the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks." *Id.* (quotations omitted).

The issue of likelihood of confusion is a question of fact, but it is amenable to summary judgment in an appropriate case. *King of the Mountain Sports*, 185 F.3d at 1089 ("Courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion."). Of course, summary judgment is not appropriate if the nonmovant demonstrates a genuine issue of material fact regarding the likelihood of confusion. *Id.* For the reasons explained below, the court concludes that no rational trier of fact could confuse the "Big Dog Motorcycles" mark with the "Big Dog(s)" apparel marks as those marks are encountered by consumers in the marketplace. Accordingly, summary judgment in favor of Motorcycles is warranted.

## A.      Degree of Similarity Between the Marks

The court examines the degree of similarity between the marks on three levels: sight, sound, and meaning. *King of the Mountain Sports*, 185 F.3d at 1090. These factors must be

evaluated "in the context of the marks as a whole as they are encountered by consumers in the marketplace." *Id.* at 1090 (quotation omitted). The court does not engage in a side-by-side comparison of the two marks, but rather must determine whether the allegedly infringing mark is confusing to the public when singly presented. *Id.* Similarities of the marks are given more weight than differences. *Id.*

In this case, the marks are similar inasmuch as they both utilize some variation of the words "Big Dog." Holdings relies heavily on this similarity between the marks and asks the court to focus on the fact that this is the dominant portion of the marks. The court finds Holdings' heavy reliance on this consideration to be misplaced for two reasons. First, it is well settled that while the dominant portion of a mark is given greater weight, the court must still consider each mark as a whole. *First Sav. Bank v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir. 1996) (holding the district court erred by relying too heavily on the appearance and pronunciation of the marks where the differences between the entire marks and their attending logos outweighed the similarities); *see also Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) (holding the district court did not err by declining to weigh this factor firmly in plaintiff's favor where there was no similarity in the parties' use and presentation of their respective trade beyond their obvious sameness of spelling); *Universal Money Ctrs., Inc. v. AT & T Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994) (affirming district court's grant of summary judgment where similarity in marks' use of the term "universal" was greatly outweighed by significant differences in overall design of products). Second, Holdings' argument is factually inapposite because Holdings does not consistently utilize its

23

mark "Big Dog" as the dominant portion of its marks.  Certainly, "Big Dog(s)" is the dominant portion of *some* of its marks.  But far more often its marks are dominated by a visual depiction of a St. Bernard-like black and white dog, often consisting of catchy dog-related phrases embedded within fun pictorial designs, *cf. Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 973 (10th Cir. 2002) (differentiating between marks consisting of words alone and those involving pictorial designs with clearly dominant visual elements), and/or a relatively small "Big Dogs" logo located somewhere on the product.

On balance, the court finds as a matter of law that notwithstanding both parties' use of the term "Big Dog" on their products, those similarities are substantially outweighed by the dissimilarities in the marks as a whole as singly experienced by consumers in the marketplace. As for the degree of similarity in sound, both marks admittedly include the term "Big Dog." But, Holdings predominantly uses the term "Big Dogs" and at times "Big Dog" whereas Motorcycles uses the term "Big Dog Motorcycles."  Thus, although the two share some similarity in sound, they are not phonetically similar when considered in their entirety.

Far more obviously, though, the two are largely dissimilar in sight and meaning.  Equally as distinctive as Holdings' use of the term "Big Dog(s)" is the fact that these terms are typically embedded in pictorial designs which also include caricatures of large anthropomorphic St. Bernard-like black and white dogs as decorative elements.  These designs frequently include attitudinal phrases and/or purported parodies of popular culture.  Following is a sampling of the manner in which Holdings uses its "Big Dog(s)" marks:

24

   

   

These graphics generally convey a fun, sassy meaning.  The relatively few pieces of apparel that Holdings has produced over the years relating to motorcycles have followed this same theme by including caricatures of anthropomorphic dogs and/or catchy slogans.   The apparel that contains graphics similar to those found in motorcycle culture contain only the "Big Dog" or "Big Dogs" mark without any reference to motorcycles.   Following is a sampling of these graphics:

   

Holdings' logo, then, generally conveys the literal meaning of its logo—that of a big dog.

In contrast, Motorcycles generally uses "Big Dog Motorcycles" in a logo form in which "big dog" appears in lower case lettering just above the word "MOTORCYCLES" in smaller, capital letters.   Additionally, the fonts used in Holdings' and Motorcycles' logos are quite different from each other.   Unlike Holdings' merchandise, Motorcycles does not use depictions of dogs on any of its products or promotional materials.   Instead, "Big Dog Motorcycles" generally uses graphics that reflect themes more common in motorcycle culture such as skulls, flames, spades, Maltese crosses, images of motorcycles, and at times buxom women.   Following is a sampling of these logos as they appear on Motorcycles' merchandise:

   

 

Although Motorcycles uses canine names such as "K9," "Pitbull," and "Mastiff" to name its motorcycle models, it does not use those names in conjunction with its use of the "Big Dog Motorcycles" mark on its apparel and collectibles.   Thus, the court does not find this consideration to be particularly significant in evaluating the meaning of the mark because although Motorcycles has taken a spin on its name (Big Dog) in naming some of its

26

motorcycle models, the dominant meaning of "Big Dog" as it is used in the mark "Big Dog Motorcycles" on its apparel and collectibles is more akin to its popular culture meaning—"the best" or "superior," i.e., THE motorcycles.   Overall, the manner in which "Big Dog Motorcycles" uses its logo conveys a meaning relating to "cool" motorcycles whereas Holdings' use of its logo conveys a meaning relating to big, fun, self confident dogs.

Thus, the court finds that each of the two marks, considered singly, are largely dissimilar in terms of their overall sight, sound, and meaning as they are encountered by consumers in the marketplace.   Accordingly, this factor weighs against finding a likelihood of confusion between the two sets of products.

## B.    Motorcycles' Intent

Proof that the alleged infringer chose a mark with the intent to copy the mark may, standing alone, justify an inference of likelihood of confusion.  *Sally Beauty Co.*, 304 F.3d at 973.   Conversely, if the evidence indicates that the alleged infringer did not intend to derive benefit from an existing mark, this factor weighs against the likelihood of confusion. *Heartsprings, Inc.*, 143 F.3d at 556.   The proper focus in evaluating intent is whether the alleged infringer intended to derive benefit from the reputation or goodwill of the holder of the mark. *King of the Mountain Sports*, 185 F.3d at 1091.

In this case, the record does not reveal that Mr. Coleman intended to derive any benefit from Holdings' reputation or goodwill.   He formed a band named "Dewy and the Big Dogs" in the early 1980s at a time that predated Holdings' predecessors' use of the marks.   He carried through his use of the term "Big Dog" from his band to his production company which was

founded in 1988, then to Big Dog Motorcycles in the early 1990s. This consideration, combined with the dissimilarity in products (a band, a production company, and a motorcycle company versus an apparel company) and the relatively common use of the term "Big Dog" in popular culture, indicates that the fact that the two companies are named similarly is merely a coincidence.

Holdings focuses on the fact that Mr. Coleman was aware of Holdings' marks and had previously unsuccessfully sought to collaborate with Holdings on t-shirt sales. Mere knowledge of a similar mark, however, is not enough to establish intent to derive benefit from the holder of the mark's reputation and goodwill. *Universal Money Ctrs., Inc.*, 22 F.3d at 1532. The proper focus remains whether the alleged infringer intended to derive benefit from the holder of the mark's reputation and goodwill. *Id.* In this case, Motorcycles has spent more than $2 million promoting its motorcycles since 2001 alone. It advertises in motorcycle trade publications. This strongly suggests that Motorcycles is relying on its own publicity and reputation, and not on that of Holdings. *Cf. id.* (finding awareness of the prior mark was insufficient to infer intent to derive benefits from the existing mark where the alleged infringer had spent $60 million promoting its own product).

In fact, Holdings' argument that Motorcycles intended to capitalize on Holdings' reputation and goodwill seems preposterous given the highly distinct nature of the parties' product lines. Motorcycles primary product line is high-end customized motorcycles that cost more than most cars. Its line of apparel exists to promote its sales of motorcycles, and its apparel line represents less than one percent of its total sales. In contrast, Holdings' primary

28

product line is apparel that sells for a miniscule fraction of the cost of those motorcycles.  It cannot logically be inferred that Motorcycles would have sought to capitalize on the term "Big Dog" in the hopes of increasing its sales of $30,000 motorcycles simply because of consumers' affinity for Big Dog apparel.  No rational trier of fact could find based on the record currently before the court that Mr. Coleman intended to derive any benefit from Holdings' reputation or goodwill.  Accordingly, this factor weighs against there being a likelihood of confusion between the two sets of products.

**C.      Similarity in Products and Manner of Marketing**[15]

The greater the similarity between the products, the greater the likelihood of confusion.  *Sally Beauty Co.*, 304 F.3d at 974.  With respect to this factor, the court separately considers (1) the similarity of products and (2) the similarity in the manner of marketing the products.  *Id.*

In this case, the similarity of products would appear at first blush to weigh strongly in favor of a likelihood of confusion with respect to Motorcycles' apparel and collectibles because the two product lines are so similar.  *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 30 (1st Cir. 1989) (noting a strong likelihood of confusion existed with respect to similarity in goods where both parties offered shirts and other wearing apparel); *cf. Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir. 1986) (holding that although the

---

[15] The court is addressing this factor before the "actual confusion" factor because an understanding of the parties' manner of marketing is necessary to an understanding of the court's analysis regarding the survey evidence that Holdings presented in support of the actual confusion factor.

district court recognized confusion based on similarity of products, it failed to give proper weight to the "virtual identity of the parties' products"). But, appropriate recognition must be given to the minimal degree of overall overlap between the products of Holdings and Motorcycles. In this respect, the court finds the Sixth Circuit's reasoning in *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 797-98 (6th Cir. 2004), to be informative. In that case, plaintiff AutoZone, Inc., which is a nationwide retailer of consumer automotive products, alleged that Radio Shack's use of the mark POWERZONE to promote a section of its retail outlets dedicated to selling various power-related items constituted infringement and unfair competition. *Id.* at 788. In evaluating the relatedness of the goods, the Sixth Circuit observed that AutoZone and Radio Shack generally occupy distinct niches and their product lines converge only in the area of power sources and power supplies, a product line which comprises less than one percent of AutoZone's total stock. *Id.* at 798. Likewise, in this case, it is undisputed that Motorcycles' apparel and collectible sales comprise less than one percent of its total sales. Thus, "there is generally no overlap, except when considering a limited subset of products." *Id.* In *AutoZone*, the Sixth Circuit held that the "minuscule overlap between the products" did not demonstrate a high degree of relatedness between the products. *Id.* Accordingly, here, although the parties' product lines are similar with respect to apparel and collectibles, the significance of that similarity is diminished by the fact that the two companies generally occupy two separate and distinct market niches. Thus, there generally is no overlap between their products except when considering a minor subset of Motorcycles' product line.

The court turns, then, to one of the most pronounced distinctions between the parties' marks under the facts and circumstances of this case—that is, their manner of marketing. The record reveals that the parties' products reach consumers through entirely different marketing channels. Holdings markets its products to the general public. It sells its apparel through its own retail stores, mail order catalogs, and Internet web site. Its retail stores are located in malls and outlet malls. Its apparel line is so diverse in its various themes that it appeals to a much broader audience than Motorcycles' much more limited motorcycle-themed apparel. Holdings advertises by way of billboards located near its retail stores, by sending mail order catalogs to its customers, and by involvement in community events such as dog parades or other sponsorships to promote its brand. In contrast, Motorcycles sells its products only through its own showroom and its licensed motorcycle dealerships. The only evidence in the record indicates that neither the showroom nor any of its dealerships are located in shopping malls and Holdings has presented no evidence to the contrary. Motorcycles advertises in motorcycle magazines and advertises on television on motorcycle industry programs. Motorcycles' apparel is more akin to logo or souvenir apparel that customers would purchase in order to identify themselves with Motorcycles' motorcycles. *See, e.g.*, *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1474 (D. Kan. 1996) (noting that customers' inability to purchase resort logoed apparel at multiple, competing locations reduced the likelihood of confusion in the resort consumer market); *cf. Michael Caruso & Co. v. Estefan Enters.*, 994 F. Supp. 1454, 1461 (S.D. Fla. 1998) (plaintiffs were unlikely to prove that the parties' retail outlets and customers were similar where defendants only sold their

clothing merchandise in a shop adjoining their restaurant in Orlando, Florida, whereas plaintiffs sold their products in shopping centers and smaller retail clothing stores all over the country). Simply put, Holdings broadly markets to essentially the general public whereas Motorcycles' markets its products only to motorcycle enthusiasts.   Notwithstanding the similarity in products, then, this consideration weighs heavily against finding a likelihood of confusion given the significant differences between the parties' respective channels of trade.   *Cf. Sunenblick v. Harrel*, 895 F. Supp. 616, 629 (S.D.N.Y. 1995) (finding no likelihood of confusion between two "Uptown" recording labels where one party was a small producer selling recordings of obscure or forgotten jazz musicians in the "straight ahead jazz" category because they were addressed to a somewhat esoteric market whereas the other party produced large-scale sales of "rap" and "hip-hop" music), *aff'd*, 101 F.3d 684 (2d Cir. 1996) (unpublished table opinion).

The court is unpersuaded by Holdings' reliance on *Sally Beauty Co*.   In *Sally Beauty*, the Tenth Circuit held that the district court erroneously relied on the fact that there was little risk of confusion because the products did not compete in the same retail outlets.   304 F.3d at 975.   The court stated that it is not required that "the allegedly infringing product be available on the same shelves."   *Id.*   The court stated that, in analyzing the similarity in the manner of marketing the Tenth Circuit has "considered whether the parties were competitors in consumer markets."   *Id.* at 974.   Thus, the key is whether the products are marketed to consumers "in competing retail outlets."   *Id.* at 975; *see also* 4 McCarthy, *supra*, § 24:51, at 24-81 to 24-85 (discussing the diminished likelihood of confusion if the goods are sold in unrelated trade

32

channels).   In *Sally Beauty*, the products at issue *were* found in competing retail outlets—namely, in beauty supply stores.   In contrast, in this case Holdings and Motorcycles' merchandise are not sold in competing retail outlets.   Holdings' products are sold in apparel stores whereas Motorcycles' products are sold in motorcycle dealerships.   The two cannot fairly be regarded as competing trade channels.   Accordingly, the court finds Holdings' reliance on *Sally Beauty Co.* to be misplaced.

Holdings also emphasizes the fact that both parties' apparel is offered for sale over the Internet.   Specifically, Holdings has its own website (www.bigdogs.com) through which it sells its merchandise.   Motorcycles displays its apparel and collectibles on its website (www.bigdogmotorcycles.com), but it does not sell merchandise through its website.   Twelve of Motorcycles' ninety-four authorized dealers, however, do sell Motorcycles' apparel and/or collectibles through their websites.   Certainly, the risk of a likelihood of confusion may increase if both parties use the Internet as a selling or advertising tool.   4 McCarthy, *supra*, § 24.53.1, at 24-89 to 24-90 (collecting case law on and discussing this issue).   The general consensus that has emerged to date among the Courts of Appeals on this issue is that "[s]ome use of the Internet for marketing . . . does not alone and as a matter of law constitute overlapping marketing channels."   *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002) (emphasis in original).   A general "reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory."   *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 637 (6th Cir. 2002).   In order to determine whether use of the Internet as a selling or marketing tool is

33

evidence that the parties utilize similar marketing channels, the court must evaluate (1) whether both parties use the Internet as a substantial marketing and advertising channel, (2) whether the parties' marks are utilized in conjunction with Internet-based products, and (3) whether the parties' marketing channels overlap in any other way.  *Id.* (quoting *Entrepreneur Media, Inc.*, 279 F.3d at 1151).

In this case, with respect to the first of these factors, Holdings has failed to provide any factual record from which a rational trier of fact could conclude that the parties' use of the Internet as a selling and/or marketing tool could be regarded as "substantial."  *See Entrepreneur Media, Inc.*, 279 F.3d at 1151-52 (holding the district court erroneously weighed the overlapping marketing channels factor in favor of finding a likelihood of confusion based solely on the fact that the parties both used the Internet as a marketing channel where it did not appear based on the record that either party's use of the Internet was significant enough to be pertinent); *see also Current Communications Group, LLC v. Current Media, LLC*, Case No. 1:05-CV-385, 2005 WL 1847215, at *5 (S.D. Ohio Aug. 2, 2005) (finding marketing channels did not overlap substantially and weighed against finding a likelihood of confusion where, despite both parties' generic Internet use, they appeared to have different target markets); *R.L. Polk & Co. v. INFOUSA, Inc.*, 230 F. Supp. 2d 780, 791 (E.D. Mich. 2002) (holding the plaintiff's general claim that both parties market their products over the Internet was insufficient to establish that they used similar marketing channels).  Although Holdings has presented evidence that five percent of its sales come from Internet *and* mail order sales, Holdings has not presented any evidence concerning the proportion of those sales

34

attributable to its Internet website.  Furthermore, Holdings has not presented any evidence to

quantify Motorcycles' Internet sales such that it could be concluded that Motorcycles uses the

Internet as a substantial marketing tool.  With respect to the second factor, the parties are not

using their marks in conjunction with any Internet-based products.  The third factor (whether

the parties' marketing channels overlap in any other way) also weighs against a finding of

overlapping marketing channels for reasons discussed previously.  Additionally, the court notes

that the parties' respective relevant websites have a look and feel similar to that which

consumers would experience in the parties' retail outlets.  Consequently, the risk of customer

confusion with respect to those websites is as unlikely as it is with respect to their Big Dog

apparel stores and Big Dog Motorcycle dealerships.  Thus, based on the record before the

court, Holdings has failed to present any evidence from which a rational trier of fact could find

that the parties' relatively generic use of the Internet creates overlapping marketing channels

so as to heighten the risk of confusion.  Accordingly, the court is unpersuaded that their use

of the Internet attenuates the fact that their products are not sold in competing trade channels.

Holdings also contends that a rational trier of fact could conclude that Holdings

somehow sponsors or is associated with Motorcycles.  The sole case relied upon by Holdings

to support this theory is a discussion in *Westchester Media v. PRL USA Holdings, Inc.*, 214

F.3d 658, 666-67 (5th Cir. 2000), concerning sponsorship confusion.  This case, however,

clearly does not involve the type of facts that would give rise to a sponsorship confusion claim.

Such a theory would apply only to the extent that the goods are *non*competing.  *See id.* at 666

(explaining confusion as to sponsorship, affiliation, or connection applies when products or

35

services are noncompeting); *see generally, e.g.*, *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999) (outdoor apparel retailer brought sponsorship confusion claim against promoter and sponsor of ski races). Thus, Holdings' only colorable sponsorship claim is with respect to Big Dog Motorcycles' *motorcycles*, not its apparel. In this respect, Holdings' advances an expansion theory. That is, "[t]he danger of affiliation or sponsorship confusion increases when the junior user's market is one into which the senior user would naturally expand." *Westchester Media*, 214 F.3d at 666. "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." *Id*. (quotations omitted). In support of this argument, Holdings relies on the fact that it has sponsored a race car; that it uses the "Big Dog Shootout" mark for drag racing; and that it has developed "fake company" identities to capitalize on certain lifestyles such as "Big Dog Surf Company," "Big Dog Trucking Company," "Big Dog Construction Company, and "Big Dog Garage." But a rational trier of fact could not conclude based on this evidence that apparel producers such as Holdings have a natural tendency to start producing or sponsoring motorcycles. The court cannot envision how any likelihood of confusion might exist with respect to such a theory. In any event, the court would weigh the same factors in a sponsorship confusion case as it would in a source confusion case such as this one. *King of the Mountain Sports*, 185 F.3d at 1090. Thus, although the record does not reveal that Holdings has an arguably viable sponsorship confusion claim, even if Holdings did have such a claim the court's analysis of the various factors would also apply to that claim.

Consequently, the court would also find that Holdings has failed to raise a genuine issue of material fact with respect to any such sponsorship confusion claim.

In sum, given the significant differences between the manner in which the parties' products are marketed and the fact that marketing practices are particularly relevant because they directly impact the way in which consumers experience the parties' respective marks, *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 556 (10th Cir. 1998), the court finds that this factor weighs heavily against a likelihood of confusion.

**D.     Actual Confusion**

Evidence of actual confusion in the marketplace is not necessary to prevail on a trademark infringement claim, but it may be the best indication of likelihood of confusion. *Sally Beauty Co.*, 304 F.3d at 974.   In this case, Holdings relies solely upon the results of the surveys conducted by its expert, Mr. Weiss, to attempt to raise a genuine issue of fact regarding the actual confusion factor.[16]   Survey evidence is a proper form of evidence of actual customer confusion, although a survey's evidentiary value depends on the methodology and questions asked.   *Id.*   Motorcycles contends that the results of Holdings' surveys are irrelevant

_____

[16] Holdings does not rely on the incidents of confusion identified by Messrs. Feshbach, Wall, and Coleman in their depositions.   For essentially the reasons stated by Motorcycles' in its memorandum in support of its motion for summary judgment, the court agrees that these relatively few anecdotal incidents do not provide meaningful evidence of any actual customer confusion surrounding Holdings' and Motorcycles' products.   *See, e.g.*, *Sally Beauty Co.*, 304 F.3d at 974 ("Evidence of actual confusion does not create a genuine issue of fact regarding likelihood of confusion if it is *de minimis*."); *King of the Mountain Sports*, 185 F.3d at 1092-93 (seven examples of actual confusion was only a de minimis "handful of anecdotal evidence"); *Heartsprings, Inc.*, 143 F.3d at 557 (confusion among random acquaintances rather than consumers was de minimis evidence of actual confusion).

37

because, among other reasons, Mr. Weiss failed to survey the relevant universe of consumers. The court agrees.

An important factor in assessing the validity of a survey is the adequacy of the survey universe. That is, the respondents to a survey "must adequately represent the opinions which are relevant to the litigation." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir. 1996) (quotation omitted). The court should exclude the survey when the sample of respondents clearly does not represent the universe it is intended to reflect, but issues concerning the sufficiency of the sample universe bears on the weight and not the admissibility of the survey. *Id.* In a traditional case such as this one claiming forward confusion, "the proper universe to survey is the potential buyers of the *junior user's* goods or services." 5 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 32:159, at 32-258.3 (4th ed. 2005) (emphasis in original); *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) ("The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services.").

In this case, the results of Mr. Weiss's survey have essentially no probative value because he did not attempt to limit the survey universe to include buyers who would be likely to purchase t-shirts and hats at motorcycle dealerships. Instead, his survey universe broadly included prospective purchasers of all t-shirts and caps. But the only consumers who are likely to buy the "junior user's goods"—that is, Motorcycles' merchandise—are those who patronize motorcycle dealerships. Indeed, Motorcycles seeks declaratory relief in this case only with

respect to its use of the marks "in conjunction with motorcycles, motorcycle parts and accessories, promotional products (including apparel and accessories), and related services." Pretrial Order (Doc. 81), ¶¶ 6(a)(1), (2).  Mr. Weiss made no attempt to limit his survey universe to this class of prospective purchasers.  Accordingly, his survey universe was "improperly over-inclusive by encompassing a group of people that includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data."  5 McCarthy, *supra*, § 32:161, at 32-258.7 to 32-258.8 & nn.1-5 (citing cases in which courts have found that the survey universe was inappropriately overinclusive); *cf. Jordache Enters. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487-88 (10th Cir. 1987) (district court did not err by giving little weight to survey results which bore "little resemblance to the actual workings of the marketplace"); *Amstar Corp.*, 615 F.2d at 263-64 (finding the plaintiff's survey was substantially defective where it surveyed women found at home during daylight hours who identified themselves as the member of the household primarily responsible for grocery buying where the survey neglected completely the defendants' primary customers which were young, single, male college students).

Holdings attempts to salvage its survey results by arguing that Mr. Weiss was attempting to measure post-sale confusion.  This case clearly is not, however, a post-sale confusion case. Post-sale confusion arises in circumstances involving so-called "knock-off" products in which observers of an allegedly infringing product are confused, to the injury of a trademark owner, by the fact that the alleged infringer has produced counterfeit, imitation, or replica goods of inferior quality.  *See generally, e.g.*, *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219

F.3d 104 (2d Cir. 2000) (alleged infringer produced knock-off replicas of Hermes handbags); *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985 (Fed. Cir. 1993) (post-sale confusion could exist where consumer may attribute any perceived inferior quality of Payless shoes to Reebok, thus damaging Reebok's reputation and image); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986) (allegedly infringing jeans replicated Levi's trademark back pocket stitching pattern); 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:7, at 23-27 to 23-32 (4th ed. 2005) (discussing the post-sale confusion doctrine).

In this case, Holdings has not produced any evidence sufficient to raise a triable issue of fact to withstand summary judgment on a post-sale confusion claim.   Most obviously, Holdings has not established that Motorcycles has tried to replicate or imitate its goods or that consumers would believe that Motorcycles' t-shirts and hats are knock-offs of Holdings' Big Dogs apparel.   Additionally, Holdings has not established that Motorcycles' goods are of inferior quality such that the sale of Motorcycles' products would damage Holdings' reputation and goodwill by virtue of the fact that consumers would attribute the inferior quality of Motorcycles' products to Holdings.   In fact, the only evidence of record indicates that Motorcycles' t-shirts retail for approximately twenty dollars each whereas the retail price of Holdings' t-shirts is fifteen dollars or two for fifteen dollars.   This suggests that Motorcycles' t-shirts are probably of superior, rather than inferior, quality to Holdings' t-shirts.   Thus, Holdings' belated post-sale confusion theory cannot serve as a substitute for the obvious point-of-sale confusion that is at issue in this case.   *See Gibson Guitar Corp. v. Paul Reed Smith*

*Guitars, LP*, 423 F.3d 539, 552 (6th Cir. 2005) (post-sale confusion could not serve as substitute for point-of-sale confusion where allegedly infringing products were not clearly inferior to the trademark holder's product).

In sum, then, Holdings has failed to raise a genuine issue of material fact regarding any actual confusion in the marketplace between Holdings' goods and Motorcycles' goods. Accordingly, this factor does not weigh in favor of finding a likelihood of confusion.

**5.      Degree of Care Likely to be Exercised by Purchasers**

"A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion." *Sally Beauty Co.*, 304 F.3d at 975. Buyers typically exercise little care in selecting inexpensive items and making impulse purchases. *Id.* Conversely, expensive items are typically chosen more carefully. *Id.* "The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase." *Id.*

The court envisions that a rational trier of fact might weigh this factor in favor of finding that consumers are likely to exercise a high degree of care under all of the circumstances here. *See, e.g.*, *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1230-31 (7th Cir. 1993) (trademark infringement case involving apparel in which the court rejected the argument that the degree of care depends solely upon price); *Jordache Enters.*, 828 F.2d at 1487 (holding the district court's finding following a bench trial that customers are likely to exercise a "high degree of care in purchasing clothing that costs between fifteen and sixty dollars" was not clearly erroneous). But, at this procedural juncture the court must weigh the evidence in the light most favorable to Holdings, the non-moving party. Viewing the evidence

41

in such a light, this case generally involves relatively inexpensive items priced at approximately ten to twenty dollars each which could fairly be viewed as "impulse buy"-type items. Therefore, in resolving Motorcycles' motion for summary judgment the court must weigh this factor against finding that purchasers are likely to exercise a high degree of care. *See Sally Beauty Co.*, 304 F.3d at 976 (district court erroneously weighed this factor in favor of finding a heightened degree of care simply because customers shopped in specialty stores). With that being said, however, these items are not entirely inexpensive. *See, e.g., Beer Nuts, Inc. v. Clover Club Foods, Inc.*, 805 F.2d 920, 926 (10th Cir. 1986) (inexpensive snack foods are purchased with little care). Additionally, purchasers must necessarily exercise some degree of care in deciding whether to purchase apparel from Holdings' retail stores or Motorcycles' dealerships. A purchaser of apparel (e.g., t-shirts and hats) would likely purchase Motorcycles' goods only if he or she were seeking to identify with Motorcycles' brand of motorcycles. Thus, although the court cannot find on summary judgment that consumers are likely to exercise a high degree of care with respect to these purchases, the court nonetheless finds that consumers must inevitably exercise *some* degree of care at the time of purchase. Accordingly, at this procedural juncture this factor weighs only somewhat in favor of finding a likelihood of confusion.

**F.      Strength or Weakness of the Mark**

"The stronger the mark, the greater the likelihood that encroachment upon the mark will cause confusion." *Sally Beauty Co.*, 304 F.3d at 975. In order to assess the relative strength of a mark, the court must consider two different aspects of strength—conceptual strength and

42

commercial strength. *King of the Mountain Sports*, 185 F.3d at 1093. Conceptual strength refers to the placement of the mark along the distinctiveness spectrum. *Id.* Commercial strength refers to the marketplace recognition value of the mark. *Id.*

In terms of conceptual strength, the categories of trademarks in descending order of strength are: (1) fanciful, (2) arbitrary, (3) suggestive, (4) decriptive, and (5) generic. *Id.* Categorization of a mark along the conceptual strength spectrum generally is an issue of fact. 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 11:3, at 11-9 to 11-10.1 (4th ed. 2005). "'Fanciful' marks consist of 'coined' words that have been invented or selected for the sole purpose of functioning as a trademark." *King of the Mountain Sports*, 185 F.3d at 1093 (further quotation omitted). "Arbitrary marks comprise those words, symbols, pictures, etc., that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic or those goods or services." *Id.* "Suggestive marks are those that suggest some quality or ingredient of the goods." *Id.* Holdings does not contend that its marks are fanciful and the court finds as a matter of law that they are not. The issue, then, is whether those marks are arbitrary or suggestive in terms of their conceptual strength. Based on the record before the court, the court would be inclined to find that they are suggestive because the term "Big Dogs" specifically suggests a quality or ingredient of Holdings' goods—that is, the prevalent nature of a pictorial design of a big dog on its products. Nonetheless, Motorcycles does not dispute

43

Holdings' contention that its marks are arbitrary.[17]   Thus, for purposes of resolving

Motorcycles' motion for summary judgment the court will accept Holdings' characterization

of its marks as arbitrary.   Regardless of whether the marks are suggestive or arbitrary, they are

inherently distinctive and hence the court must weigh their conceptual strength as being strong.

In terms of commercial strength, a strong trademark is rarely used by parties other than

the owner of the trademark whereas a weak trademark is often used by other parties.  *First Sav.*

*Bank v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir. 1996).  The greater the number of

identical or similar marks already in use on different kinds of goods, the less the likelihood

of confusion between any two specific uses of the weak mark.  *Id.* at 653-54.  Thus, "extensive

third-party use of the disputed term indicates that the term itself deserves only weak

protection."  *Id.* at 654.  Motorcycles contends that it has demonstrated that a large number of

businesses use the term "Big Dog" in connection with their businesses.   Specifically, the

record submitted by Motorcycles reflects that Dun & Bradstreet lists 763 businesses, other

than the parties to this case, which operate under a name including the term "Big Dog."  Eleven

federal trademark registrations and thirty-three state trademark registrations are owned by

other parties using the words "Big Dog."  Moreover, Holdings' general counsel testified in his

deposition that he had been asked on forty or fifty occasions whether Holdings was associated

with various other entities.   But the relevant inquiry in evaluating the commercial strength or

weakness of Holdings' mark is not the extent to which *any* other third parties may be using

---

[17]  Instead, Motorcycles' arguments focus on the arguable lack of commercial strength of Motorcycles' marks rather than on their arguable lack of conceptual strength.

similar marks, but rather whether they are using similar marks "on similar goods." 2 McCarthy, *supra*, § 11:88, at 11-167; *see, e.g.*, *First Sav. Bank*, 101 F.3d at 653-54 (extensive use of the term "First Bank" made it a weak mark, "at least when applied to the provision of financial services"); *Universal Money Ctrs., Inc. v. AT & T Co.*, 22 F.3d 1527, 1533-34 (10th Cir. 1994) (the term "Universal" was a relatively weak mark where it was used by approximately six other financial institutions on their own ATM cards and by two credit card companies). This is because the evidentiary impact of such third party marks turns upon the probable impact of the use of those marks on the minds of the target group of consumers. 2 McCarty, *supra*, § 11:88, at 11-168. Here, the only evidence that Motorcycles has presented with respect to third-party use of the term "Big Dog" in connection with apparel involves two different instances in which Holdings has given its consent to specific entities using the term "Big Dog" in conjunction with their apparel. Specifically, Holdings consented to Big Dogs Hospitality Group using the mark Big Dog Casino on souvenir clothing and collectibles sold at the casino and Holdings consented to Metra Electronics Corporation using the mark Big Dog Installers on its promotional items.[18] Even with respect to these items, however, Motorcycles has not presented the type of widespread use of the "Big Dog(s)" mark on apparel that would serve to weaken the mark in the minds of apparel consumers. Thus, just as with

---

[18] Holdings' predecessor also agreed to allow NBA basketball player Glenn Robinson to use the words "Big Dog" on certain items including t-shirts, although there is no suggestion in the record that Mr. Robinson has actually done so.

conceptual strength, Holdings has demonstrated a genuine issue of material fact such that the court must weigh its commercial strength as being strong.

**G.      Balancing of Likelihood of Confusion Factors**

After considering all of the factors relevant to the likelihood of confusion analysis, the court concludes that Holdings has failed to demonstrate that a rational trier of fact could find that consumers are likely to be deceived or confused by the similarity of Holdings' and Motorcycles' marks.  Certainly, the parties' marks are similar inasmuch as they both involve the use of the term "Big Dog" in conjunction with apparel and collectibles.  Also, considered in the light most favorable to Holdings as the non-moving party, its marks are arguably strong, both in terms of their conceptual and commercial strength, and consumers may not be likely to utilize a particularly high degree of care in selecting between apparel from Holdings or Motorcycles.

Nevertheless, despite some factors weighing in Holdings' favor, the balance tips overwhelmingly toward Motorcycles as the most crucial factors are considered.  The degree of similarity between the marks forms the heart of the court's analysis, and the parties' respective marks considered singly are largely dissimilar in terms of their overall sight, sound, and meaning as they are encountered by consumers in the marketplace.  Particularly pertinent to the court's conclusion on this matter is the fact that the manner of marketing with respect to the two product lines are completely dissimilar inasmuch as the two sets of products are not sold in competing trade channels.  Holdings' merchandise is sold in its own apparel stores whereas Motorcycles' merchandise is sold in its own motorcycle dealerships.  This directly

46

impacts the way in which consumers experience the parties' respective marks and therefore substantially diminishes the likelihood of confusion.   Moreover, it cannot fairly be inferred based on the record that Motorcycles intended to derive any benefit from Holdings' reputation and goodwill or that there is relevant evidence of actual confusion in the marketplace.   There being no genuine issue of material fact with respect to the issue of likelihood of confusion, then, summary judgment against Holdings and in favor of Motorcycles is warranted.   *See generally, e.g.*, *King of the Mountain Sports*, 185 F.3d at 1084 (affirming district court's grant of summary judgment where no likelihood of confusion existed even though the parties' marks included a similar phrase and the senior user's mark was "quite strong"); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550 (same, despite the parties' virtually identical trade names and the strength of plaintiff's suggestive name); *Universal Money Ctrs., Inc.*, 22 F.3d at 1527 (10th Cir. 1994) (same, although both marks used the word "universal" and reasonable jury could conclude that services offered were similar).

**IT IS THEREFORE ORDERED BY THE COURT** that Motorcycles' Motion for Summary Judgment (Doc. 69) is granted.   Accordingly, the clerk is directed to enter a declaratory judgment of noninfringement and no unfair competition against Big Dog Holdings, LLC, and in favor of plaintiff Big Dog Motorcycles, L.L.C.

**IT IS FURTHER ORDERED** that the parties' remaining pending motions (Docs. 67, 73, 75 & 96) are denied as moot.

**IT IS SO ORDERED** this 2nd day of December, 2005.


   **s/ John W. Lungstrum**
John W. Lungstrum
United States District Judge